# CASES

IN THE

# SUPREME COURT OF ALABAMA.

## NOVEMBER TERM, 1895.

## Crawford v. The State.

### *Indictment for Murder.*

1. *Pleading and practice; filing of plea in abatement after organization of jury, within discretion of the court.*—After the selection and organization of the jury in a criminal prosecution, it is within the discretion of the trial court to suspend the trial for the purpose of enabling counsel to examine the records of the court, with a view of filing a plea in abatement to the indictment; and the exercise of this discretion is irrevisable.

2. *Same; plea of not guilty an admission of the genuineness of the indictment; must be withdrawn before plea in abatement can be filed.* A plea of "not guilty" in a criminal case is an admission of the genuineness of the indictment, and a waiver of all irregularity in the filing or presenting of it; and after the filing of such plea, it must be withdrawn, by seasonable application to the court, before a plea in abatement to the indictment, on the ground of irregularity in the drawing of the grand jury, can be filed.

3. *Same; a plea in abatement can not be oral.*—Oral pleas, except the pleas of "guilty" and "not guilty," delivered in open court and received by the clerk and entered on the minutes, are unknown to the practice in this State; and it is proper for the court to refuse to entertain an oral plea in abatement alleging irregularity in the drawing of the grand jury.

4. *Evidence; illicit relations between witnesses irrelevant.*—On a trial under an indictment for murder, evidence of illicit sexual relations between two of the principal witnesses for the State is irrelevant and inadmissible.

5. *Same; same; not admissible to discredit the witnesses.*—On a trial under an indictment for murder, the fact that there existed between two of the principal witnesses for the State illicit sexual relations, is not admissible for the purpose of discrediting said witnesses.

6. *Same; impeaching witness by evidence of collateral facts.*—A witness can not be cross-examined as to any fact collateral or irrelevant

1

[Crawford v. The State.]

to the issue, merely for the purpose of contradicting him; and if cross-examined as to a matter collateral, irrelevant or immaterial, his answer can not be contradicted by the party asking the question, but is conclusive against him.

7. *Same; conduct of State's witness after the homicide irrelevant and inadmissible.*—Where, on a trial under an indictment for murder, it is shown that the homicide was committed by the defendant, the fact that one of the State's witnesses, who saw the killing, but in no way aided or abetted in its perpetration, concealed himself from the officers of the law who came to the house after the commission of the homicide, and the other conduct of such witness subsequent to the homicide, is wholly irrelevant, immaterial and inadmissible in evidence.

8. *Same; recalling of witness within the discretion of the court.* Whether a witness shall be recalled and re-examined with a view to his contradiction is a matter within the discretion of the trial court; and the exercise of this discretion is not revisable on appeal.

9. *Same; competency of evidence in rebuttal.*—Where, on a trial under an indictment for murder, the defendant testified that he went to the house where the homicide was committed, for the purpose of seeing the occupant, a woman, about a mortgage he held against her husband who was in the insane asylum, it is competent for the State to prove in rebuttal that the mortgage had been paid; and a receipt given by the defendant to said woman acknowledging full satisfaction of the mortgage, is admissible in evidence.

10. *Same; admissibility in evidence of pistol balls.* — Where, on a trial under an indictment for murder, it is shown that the deceased was killed by a pistol shot, a pistol ball which a witness testified he thought was the one extracted by him from the body of the deceased at the autopsy, and another ball, which another witness testified he thought was the one taken from the side of the house where the killing occurred, are admissible in evidence; the fact as to whether the balls produced were identified as the balls taken from the body of the deceased and from the side of the house being a matter for the consideration and determination of the jury.

11. *Same; competency of question impeaching character of witness.* Where a witness testifies that the general character and character for truth and veracity of another witness is bad, for the purpose of impeachment, it is permissible to ask the witness so testifying, whether from his knowledge of the character of the witness sought to be impeached, he would believe him on oath; and it is error for the court to refuse to allow such question.

12. *Limitation of argument of counsel; constitutional guaranty; error must be affirmatively shown.*—The provision of the constitution guaranteeing to the defendant in a criminal prosecution that "he has a right to be heard by himself and counsel, or either," does not deprive the trial court of the discretionary power to limit the argument of defendant's counsel to the jury to a certain length of time, provided

[Crawford v. The State.]

in the exercise of this discretion the accused is not, under the facts and circumstances of the particular case, denied the full measure of his constitutional right; and while the exercise of the discretion is subject to revision on appeal if it has been arbitrarily or imprudently exercised, error can not be presumed, but must be affirmatively shown.

13. *Same; same; facts of this case.*—In considering the propriety of the exercise of the discretion of the court in limiting the argument of defendant's counsel in a criminal case, the number of witnesses examined, the character of the evidence, the time consumed in the trial, the duration of the term of the court, and other matters pertaining to the trial should be considered; and where there were eight witnesses examined for the State and fourteen for the defendant, and the facts were not unusually complicated, and there was no unusual conflict in the evidence as to material facts, and it does not appear that in argument the counsel for the defendant occupied the time allotted to them, or, having fully occupied it, they requested an extention of time in order to fully present the defendant's case, it can not be said that the limitation by the court, before the argument began, to one and a half hours to each side for argument to the jury, was an improper exercise of the discretion of the court in the particular case.

14. *Failure to introduce witness; does not justify unfavorable inference; proper restraint of argument of counsel.*—Where in a criminal case, a witness whose evidence would be competent for either party, was in court during the trial and equally accessible to the State or the defendant, no unfavorable inference arises against the State for its failure to call and examine such a person as a witness, although he was present at the time of the commission of the offense charged; and it is not permissible for the defendant's counsel, in his argument to the jury, to say that the failure of the State to examine said witness should be considered in defendant's favor, and it is proper for the court to restrain defendant's counsel from this proposed argument.

15. *Sufficiency of indictment for homicide; variance.*—An indictment for homicide must be so certain as to the party against whom the offense was committed as to notify the prisoner who such party is; and variance in the allegations and proof upon that point is fatal to conviction under the indictment, unless amended to comport with the evidence, as allowed by statute, (Cr. Code of 1886, §§ 4389-90).

16. *Joint indictment; necessity of conviction of all defendants.*—Where defendant and another are jointly indicted for homicide, it is not necessary to show that they acted jointly in its commission; but if defendant alone committed the crime, he may be convicted as if alone indicted.

17. *Evidence of good character, charge in reference thereto.*—In a criminal case, evidence of good character may be sufficient to generate a doubt, but only when considered in connection with the other evi-

[Crawford v. The State.]

dence in the case; and a charge which instructs the jury that "good character, if proven, may have the effect to generate such a doubt as to authorize an acquittal, even when the jury would otherwise entertain no doubt," is properly refused as giving undue prominence to the evidence of good character, and because it dissociates the evidence of good character from the rest of the evidence in the case.

18. *Instructions not supported by the evidence.*—All charges must be based upon the evidence, and an instruction requested, raising an inquiry as to a matter of which there is no evidence, is erroneous and properly refused.

19. *Impeaching witness by contradictory statements; must be as to material jacts; province of the jury in reference thereto.*—To impeach a witness by showing statements made by him out of court, contrary to his testimony on trial, the contradiction must be as to a material fact; and it is the province of the jury to determine the extent to which the witness's credibility is affected by such contradiction.

20. *Same; same; same.*—An instruction seeking to charge the jury upon the effect of contradictory statements made by witnesses out of court, as discrediting their entire testimony, and which does not predicate that the contradiction was in reference to a material fact, is erroneous as announcing an incorrect proposition of law, and also as an invasion of the province of the jury.

21. *Impeachment of witness; charge as to the effect thereof.*—A charge which instructs the jury that "If one or more of the State's witnesses have been impeached, this may be sufficient to generate in the minds of the jury a reasonable doubt as to defendant's guilt in this case," is erroneous and properly refused.

22. *Reasonable doubt; charge to the jury.*—An instruction requested by the defendant that he must be acquitted, unless the evidence against him "should be such as to exclude to a moral certainty every hypothesis but that of his guilt," is erroneous and properly refused.

23. *Homicide; threats made by deceased; charge to the jury.*—An instruction that the jury may look to threats made by deceased against the defendant to aid them in determining who was the aggressor, and thereby generate a doubt as to defendant's guilt, directs the jury's attention to a particular fact to the exclusion of a consideration of the evidence in its entirety, and is, therefore, properly refused.

24. *Protection of dwelling by guest.*—A guest at a dwelling house is entitled to the protection which the law affords the owner or more permanent occupant, and he may repel trespasses in and upon the house, and repel assaults, actual or menaced, as if he was under his own roof and within his own doors.

25. *Same; same; charge of court to jury.*—Where, on a trial under an indictment for murder, it was shown that the defendant, with others, entered the house owned and occupied by a woman, and that upon her father-in-law, who was staying at the ;house, ordering them to leave, the difficulty ensued, which resulted in the killing of the father-in-

[Crawford v. The State.]

law, a charge which instructs the jury that if they "believe from the evidence that the deceased was in a house not his own, and that he was only boarding there temporarily, and that his house and where his family resided was at another place, then he could not be protected as being in his own house," is erroneous and properly refused; since the deceased was in the house rightfully and had the legal right to defend it and its inmates, resorting to no greater force than a necessity of the offense required, and the instruction was a denial of this right to the deceased.

26. *Self-defense; there must be freedom from fault in bringing on the difficulty.*—In order to successfully invoke the plea of self-defense, the defendant must be free from fault in bringing on the difficuty, and the law admits of no qualification of this requirement; and a charge which instructs the jury that if the defendant was "reasonably free from fault in bringing on the difficulty," he can successfully invoke the plea of self-defense, is erroneous and properly refused.

27. *Misleading charges should be refused.*—Precision and definiteness is an indispensable element of instructions to the jury; and charges requested which require explanation or qualification should be refused as being calculated to mislead and confuse the jury.

28. *Homicide; trespass as affecting the right of self-defense.*—Where, on a trial under an indictment for murder, the evidence showed that the defendant, with two companions, entered the house where the deceased was a guest, in a disorderly manner, with pistols in their hands, and upon the deceased ordering them to make known their business or to depart, the defendant and one of his companions presented their pistols within shooting distance, whereupon the deceased seized his gun and pistol and was slain in the ensuing difficulty, a charge to the jury which instructed them that if the defendant went to the house for no purpose of doing injury to any one, and when he entered the house where the deceased was he made no effort to do violence, and if when leaving the deceased pursued him with his gun, the defendant had the right to defend himself, even to the extent of taking his assailant's life, if necessary, is properly refused.

29. *Protection of dwelling; right to eject trespassers.*—One who is rightfully in the house and therefore, lawfully entitled to the protection of its peace and security, may require a stranger, who intrudes without permission, to depart, and if he persists in remaining, may use necessary force to eject him; the kind and degree of force depending upon the conduct of the intruder.

30. *Homicide by the aggressor, after attempting retreat; self-defense.*—In a case of homicide, the general rule is that the aggressor can not urge in his justification a necessity caused by his own wrongful act; but if the aggressor withdraws from the conflict in good faith, after having provoked it, and clearly announces his desire for peace and his intention to retire, and is then pursued by his adversary, his right to take life in self-defense is revived.

31. *Same; same; facts of this case.*—Where, on a trial under an in-

[Crawford v. The State.]

dictment for murder, it is shown that the defendant and his compan-
ions, with weapons in their hands, unlawfully entered the house in
which the deceased was a guest, and were ordered out by the latter,
whereupon the difficulty ensued, and the deceased followed them to
the door and was shot, a charge to the jury which instructs them that
if the defendant, in good faith, abandoned the difficulty and was
leaving the house, and that the deceased followed and pointed his gun
at the defendant, then the defendant had a right to defend himself,
even by the taking of life, if necessary, is properly refused.

APPEAL from the Circuit Court of Cleburne.

Tried before the Hon. GEORGE E. BREWER.

The appellant, Ben Crawford, was jointly indicted
with Henry Evans for murder in the second degree, for
killing one A. M. Palmer, was convicted of manslaugh-
ter in the first degree, and sentenced to nine years im-
prisonment in the penitentiary. On motion of the ap-
pellant, there was a severance, and Ben Crawford was
tried separately. Before entering upon the trial, and
after the jury had been selected (the defendant having
pleaded "not guilty" at a former day of the court), the
defendant's counsel asked for time to examine the minutes
of the court, with a view to filing a plea in abatement;
but the court required the defendant's counsel to proceed
with the trial. The defendant offered to plead orally to
the fact that the grand jury which preferred the indict-
ment was not drawn by the persons required by law; but
the court refused to entertain this plea, and required the
defendant to proceed with the trial; and to this action
of the court the defendant duly excepted.

The State introduced one Wright Williamson as a wit-
ness, who testified that he was at the house of Alice
Palmer, the daughter-in-law of the deceased, on the night
old man Palmer was killed. That after old man Palmer
and his daughter-in-law and the witness had finished
supper, he, the witness, and old man Palmer went into
the back room of the house; that while they were sitting
on a bed, the defendant, Ben Crawford, Henry Evans
and Henry Boman came into the house through the back
door without knocking, and stood in front of the door to
the back room, where the deceased and the witness were;
that defendant and Henry Evans each had pistols in
his hand; that upon being asked by the deceased what
they wanted, one of the three replied, that it was none
of his d—— business; that Palmer then said, "tell

[Crawford v. The State.]

your business or get out of the house." That upon one
of them saying I will get out when I get ready Evans
and Crawford presented their pistols at the deceased, who,
thereupon picked up a double barrel shot gun, and im-
mediately a pistol was fired by Crawford or Evans; that
a scuffle ensued in which the witness was pulled out of
the house; that upon the deceased coming to the little
platform in the back of the house and telling Evans and
the defendant to turn the witness loose, Crawford fired
a pistol at the deceased, who fell upon the floor, and
shortly thereafter died. This witness further testi-
fied that he sometimes went to the house of Alice Palmer,
where the killing occurred; and upon his further testi-
fying that Alice Palmer was a woman of bad character
for chastity, the witness was asked, on cross-examina-
tion, several questions relative to illicit relations between
him and Alice Palmer. To each of these questions the
State objected, the court sustained the objections to each
of the questions, and to each of such rulings the defend-
ant separately excepted. The witness, Wright William-
son, further testified that he was arrested on the night
of the killing at the house of Alice Palmer, and that at
the time the officers came to the house, he was under a
bed in one of the rooms of the house, and came from
under said bed upon being ordered by the officers to do
so. The defendant's counsel then asked the witness:
"Did you not climb up into the loft of the house when
the officers, about six hours after the killing, were about
the house, and before they came into the house?" The
solicitor objected to this question, the court sustained
the objection, and the defendant duly excepted. This
witness further testified that the night of the killing,
about 11 o'clock or 12 o'clock, some persons came and
asked to be let into the house, but were refused until
they began to prize the door open, when they were
admitted about a half hour after they first asked to be
let in. For the purpose of explaining the conduct of the
witness in remaining at the house after the killing, he
was asked by the solicitor: "What did Mrs. Palmer
say to you after the killing?" The defendant objected
to this question, on the ground that the defendant was
not shown to have been present. The court overruled
the objection, and the defendant duly excepted. The
witness answered, "She asked me to stay all night";

and the court overruled the defendant's motion to exclude the answer, and to this ruling the defendant duly excepted.

Mrs. Henry Boman, the wife of Henry Boman, who was with the defendant at the house of Alice Palmer at the time of the killing, testified, among other things, that on the night of the killing about 8 o'clock, her husband and the defendant and Henry Evans came to her house, and that while they were sitting in the house, Evans said: "I shot, and it's a curious thing if I missed," and Crawford said: "I shot too"; but that this was all that was said, and no name was mentioned.

Alice Palmer and Thomas Palmer, her son, about 12 years of age, testified to facts tending to corroborate the testimony of the witness, Wright Williamson.

Upon the cross-examination of A. M. Brooks, a witness for the State, he testified that some time before the homicide, he had heard old man Palmer say that he intended to kill the defendant and some other men referred to, if they did not stay away from the house of Alice Palmer; but that this threat was not communicated to the defendant by the witness until after the killing, and the defendant was in prison.

Upon the cross-examination of E. P. Hartsfield, a witness for the State, the defendant asked him several questions relating as to where the witness Wright Williamson was found on the night of the homicide, when they went to the house of Alice Palmer to arrest him. The solicitor objected to each of these questions, the court sustained each of the objections, and to each of such rulings the defendant separately excepted

The bill of exceptions stated that "By permission of the court, Thomas Palmer was recalled on cross-examination for the purpose of laying a predicate to contradict him, and there was first read to him from his testimony before the coroner, and he was asked if before the coroner's inquest he did not testify that when defendant and Evans came in the house the night of the homicide that they said to his grandpa, the old man Palmer, to shoot and they would see who could shoot first. Witness answered, he did not know; if he did, he must have told a story. The witness then stood aside, and defendant's counsel then proposed to again recall said witness to ask him the following question: 'Were you not examined on the

trial of defendant Crawford and Henry Evans before
Judge Baber, and did you not swear on that trial that,
as you went around the house as defendant and Evans
and Williamson were coming out of the house, and while
about the chimney, that you heard a pistol shot in the
fireplace room?' The court refused to permit the
defendant's counsel to ask this question, on the ground
that they had had full opportunity for laying predicate
and had examined witness fully; and to this ruling the
defendant excepted.''

Upon J. T. Ward, a witness for the defendant, testi-
fying that the general character of Wright Williamson
and Alice Palmer was bad, and that their character for
truth and veracity was bad, he was asked by the defend-
ant's counsel the following question: ''From your
knowledge of Wright Williamson's character, would you
believe him on oath?'' The solicitor objected to this
question, the court sustained the objection, and the
defendant duly excepted.

The testimony for the defendant tended to show that
the defendant went to the house of Alice Palmer to
see something about a mortgage which he held
against her husband, who was, at the· time, in
an insane asylum, and upon which a partial pay-
ment had been made; that Henry Evans went there
to get the deceased, who was a blacksmith and gunsmith,
to fix his pistol, as the deceased had told him to bring it
to him, and that Henry Boman went with them at their
request; that as they were on their way to the house of
Alice Palmer, a man who had had the defendant's pistol
for the purpose of selling it, gave it to the defendant,
and he carried it along in his hand. That when they
went in the house, Henry Evans spoke to old man Pal-
mer, who at once arose with a stick in his hand, and
raised it as if to strike the defendant; that Boman
caught the stick and said, ''Old man, don't do that.''
That Palmer turned the stick loose, stepped back to the
other room, got his gun, presented it at them and told
them to get out of the house; that about the same time
a pistol was fired from the back room, and immediately
Wright Williamson came from the room where the pistol
was fired; that after the pistol was fired Williamson
caught hold of Evans and the defendant, and they all
walked out through the adjoining room to the back door;.

that just as the defendant was going out of the door, old man Palmer came after them with his double-barrelled shotgun, and presented it at the defendant and snapped said gun at the defendant; and that thereupon the defendant fired upon old man Palmer. It was further shown by the testimony that on the night of the killing there was discovered in the back room to the rear of the back room where old man Palmer was at the time the defendant came into the room a bullet hole in the wall, and that afterwards the ball was taken therefrom; and upon the witness, who extracted the ball from the wall, testifying that he thought it was the same ball, from detecting certain identifying marks which he had placed thereon, the ball was introduced in evidence, against the objection and exception of the defendant. On autopsy held on the body of old man Palmer, a ball was extracted therefrom, and upon the witness who was present at the autopsy and extracted the ball testifying that he thought it was the same, this ball was introduced in evidence against the objection and exception of the defendant.

In rebuttal the State introduced evidence tending to show that Alice Palmer had paid the mortgage which her husband had given to the defendant at some time prior to the homicide; and, against the objection and exception of the defendant, a receipt given by the defendant, acknowledging the payment of the mortgage in full, was introduced in evidence.

The defendant introduced several witnesses, who testified that they knew the general character of Wright Williamson and Alice Palmer in the community in which they lived, and their general reputation for truth and veracity, and that it was bad.

After the evidence was all in and before the argument begun, the court limited the time for argument to the jury to one and one-half hours to each side, and refused to allow defendant's counsel a longer time for argument to the jury than one and one-half hours. To this action of the court defendant duly excepted.

One of defendant's counsel, in his argument, said, in substance, that the State had failed to examine one Henry Boman, who was an eye witness to the homicide, and who knew more about it than anybody else present at the time of the killing, and that this was a circumstance to be considered by the jury in favor of the defendant.

[Crawford v. The State.]

Upon the solicitor objecting to this statement, the court sustained the objection, and excluded the statement that Boman knew more about it than anybody else from the the jury. To this action of the court the defendant duly excepted.

Upon the introduction of all the evidence, the defendant requested the court to give to the jury the following written charges, and separately excepted to the court's refusal to give each of them as asked : (1.) "If the jury believe from the evidence that any of the State's witnesses have made a statement or statements out of court, or on a former investigation of this case, inconsistent with the testimony of such witness on this trial, the jury have a right to look at this as evidence tending to impeach such witness or witnesses." (3.) "Unless the evidence against the defendant should be such as to exclude to a moral certainty every hypothesis but that of his guilt, the jury must find him not guilty." (6.) "If the jury believe from the evidence that when defendant entered the house where deceased was, that he, defendant, made no effort to do violence to deceased or any other person, then the deceased had no right to assault defendant with his gun. And if the jury further believe that defendant was leaving the house and deceased pursued him with his gun, and that defendant was or appeared to be in danger of his life or of great bodily harm from deceased, and to have attempted to retreat would have apparently increased his danger, then the defendant had the right to defend himself, even to the taking of the life of his assailant." (13.) "The court charges the jury that they may look to any threats made by deceased against the defendant to aid them in determining who was the aggressor, and thereby to generate a doubt in their minds as to the guilt of the defendant." (14.) "The court charges the jury that they may consider any threats shown by the evidence made by deceased against defendant for the purpose of aiding them in determining who was the aggressor, and thereby generate a doubt of the defendant's guilt, even though they may believe such threats were not communicated to the defendant." (15.) "If the jury believe from the evidence that the deceased was in a house not his own home, but that he was only boarding there temporarily, and that his home and where his family and himself resided was at another place, then

[Crawford v. The State.]

he would not be protected as being in his own home."
(16.) "Even if the jury believe from the evidence that de-
fendant was at fault in bringing on the difficulty, yet if
they further believe from the evidence that he had in good
faith abandoned the difficulty, and was leaving the
house, and that deceased followed him with his gun and
presented the gun at defendant in such close proximity
to defendant as to have rendered retreat perilous, then
defendant had a right to strike in defense of himself,
even to the taking of the life of his assailant, if appar-
ently necessary to free himself from danger." (18.)
"If the jury believe from the evidence that defendant
went to the house where deceased was on the evening of
the homicide with no purpose to do injury to any per-
son, and that he was leaving the house without having
committed an assault on deceased or any person in the
house, and that deceased followed defendant to the door
with his gun, and presented the gun at defendant in such
close proximity to defendant that to attempt to retreat
would have been hazardous, then defendant had a right
to strike in defense of himself, even to the taking of the
life of his assailant, if necessary to free himself from
danger." (18½.) "If the jury believe from the evi-
dence that defendant went to the house where
deceased was for no purpose of committing an
assault upon the deceased or any other person, and that
he said or did nothing while in the house and before the
killing calculated to cause a breach of the peace, they
must find the defendant not guilty." (24.) "If one
or more of the State's witnesses have been impeached,
this may be sufficient to generate in the mind of the jury
a reasonable doubt as to defendant's guilt in this case,
and if under all the testimony there is a probability that
defendant was without fault in bringing on the diffi-
culty, and that he fired the fatal shot under the reason-
able apprehension that it was necessary to shoot in order
to save his own life, or to save himself from great bodily
harm, then the jury must find the defendant not guilty."
(25.) "No matter what may have been the purpose of
defendant in going to the Palmer home, if he was reas-
onably free from fault in bringing on the difficulty,
then he can successfully invoke the doctrine of self-
defense; and if he fired the fatal shot when there was a
reasonable apprehension of losing his own life or of suf-

fering great bodily harm, then the jury must find the defendant not guilty." (27,) "If the jury believe from the evidence that deceased ordered defendant out of the house, and that defendant turned and was leaving the house, and made no attempt to do any violence to deceased, and that deceased pursued him with a gun and presented the gun at defendant in such close proximity to defendant as to render retreat hazardous, then defendant had the right to strike in defense of himself, even to the taking of his assailant's life, if necessary to free himself from danger." (30.) "If the jury believe from the evidence that defendant went to Alice Palmer's house on the evening of the homicide for no purpose of doing violence to any person, and after they reached the house got into an altercation with Wright Williamson, and were doing or attempting to do no violence to deceased, and deceased was pursuing defendant with a gun and presented the gun at defendant in dangerous proximity to defendant, and that to attempt to retreat would have apparently increased his danger, then defendant had a right to strike in self-defense, even to the taking of the life of his assailant, if necessary, to free himself from danger of his life or serious bodily harm, and if the jury so find, they should find the defendant not guilty." (31.) "Good character, if proved, may have the effect to generate such a doubt as would authorize an acquittal, even when the jury would otherwise entertain no doubt." (32.) "If the jury believe the evidence in this case, they must find the defendant not guilty." (A.) "The court charges the jury that if they believe from the evidence that the defendant, Ben Crawford, and Evans and Boman went to the house of Alice Palmer to make the witness, Wright Williamson, "break-over," or "tear out," and did not thereby intend to kill him, or do him any great bodily harm, but only intended to have some fun; and further that they had no intention to harm or hurt the deceased, and that, at the time the defendant fired the fatal shot, he was in danger of imminent peril to his life or of great bodily harm from the deceased, or it appeared to him that he was in such danger, and the circumstances were such as to impress the mind of a reasonable person with such belief, and did so impress the mind of defendant, and that defendant was not in fault in bringing on such actual or apparent danger to his life or body

[Crawford v. The State.]

from the deceased, and that the defendant could not have retreated without increasing his danger, then he is not guilty of murder in the second degree as charged in the indictment." (B.) "This defendant is jointly indicted with one Henry Evans ; and if the proof shows the commission of the offense charged in the indictment severally by each, there can be no conviction of the defendant in this case, and the jury should, in that case, find the defendant not guilty." (C.) "If the defendant fired the fatal shot solely as the result of sudden and imminent peril to himself, from which there was no other reasonable mode of escape, then he did not shoot with malice, and he can not be convicted of murder ; and if he was reasonably free from fault in bringing on the the difficulty and fired the fatal shot under the reasonable belief that it was necessary to shoot in order to save his own life, or to save himself from being shot with a gun in the hands of deceased, when there was no other reasonable mode of escape in time to avoid being shot, then the jury must find the defendant not guilty." (D.) "In this case before this defendant can be convicted it must be shown by the evidence beyond a reasonable doubt that the defendant and Henry Evans acted jointly, and if the proof has failed to show this, or if it has shown that they acted separately and independently of each other in what they did, then the jury must find the defendant not guilty." (E.) "The court charges the jury that they may acquit the defendant of all offense except manslaughter, although the jury may believe from the evidence that defendant brought on or encouraged the difficulty which led to the homicide."

MELRILL & BRIDGES AND R. B. KELLY, for appellant. Declarations or acts of third persons not in the presence of the accused should not be received in evidence against him.—*Hall v. State*, 51 Ala. 9 ; *Tolbert v. State*, 87 Ala. 27. A witness may be impeached by disproving the facts stated by him.—1 Greenl. Ev., § 461. A witness who testifies that the character of another witness is bad for truth and veracity may be asked, if from that character he would believe him on oath.—1 Greenl. Ev., § 461.

It is error to refuse a charge that if a witness has made a statement out of court, or on a former investigation of the case, inconsistent with his testimony at the

[Crawford v. The State.]

trial, the jury have a right to look at this as evidence tending to impeach the witness.—*Harris v. State*, 96 Ala. 24.

A charge asked in a criminal case, instructing the jury that they must find the defendant not guilty, unless the evidence against him is such as to exclude to a moral certainty every hypothesis but that of his guilt, asserts a correct legal proposition, and its refusal is a reversible error.—*Riley v. State*, 88 Ala. 188; *Ib.* 193.

A charge that if the defendant was reasonably free from fault in bringing on the difficulty, and was attacked by the deceased with a deadly weapon in such close proximity as to render retreat apparently hazardous, the defendant would have the right to defend himself even to the taking of his assailant's life, asserts a correct legal proposition, and should be given.—*DeArman v. State*, 71 Ala. 351; *Rogers v. State*, 62 Ala. 170; *Mitchell v. State*, 60 Ala. 26.

It is error for the court to refuse to charge the jury that they may look to any threats shown to have been made by the deceased against the defendant, to aid them in determining who was the aggressor, and thereby to generate a doubt in their minds as to the defendant's guilt.—*DeArman v. State*, 71 Ala. 351.

When one who was originally in fault, has in good faith, withdrawn from the difficulty, he may strike in self-defense, other circumstances justifying.—Hor. & Thomp. on Self Defense, 213; 4 Amer. & Eng, Encyc. of Law, 692.

In a case where the witnesses are numerous and the facts complicated, the limitation of the argument of counsel for the defendant in time to one and one-half hours, is an abuse of the discretion of the court.—2 Encyc. of Plead. & Prac. 703, notes 5 and 6; *Wingo v. State*, 62 Miss. 311; *People v. Labadie*, 66 Mich. 702; *Walker v. State*, 32 Tex. Crim. Rep. 175.

When there is a variance between the allegations in the indictment and the proof, as to the name of the person slain, the court should give the affirmative charge at the request of the defendant.—*Page v. State*, 61 Ala. 16; 1 Bishop Crim. Proc., § 689; *Graham v. State*, 40 Ala. 659.

The affirmative charge should have been given in this case, there being a fatal variance between the allega-

[Crawford v. The State.]

tions in the indictment and the proof as to the name of the party slain. The only name of the deceased, proven, was "Ace" Palmer, and there is no such name charged in the indictment. Neither is the name proven and any of the aliases named in the indictment *idem sonans*. *Page v. State*, 61 Ala. 16; *Adams v. State*, 67 Ala. 89; *Munkers v. State*, 87 Ala. 94; *Rooks v. State*, 83 Ala. 79; *Robson v. Thomas*, 55 Mo. 581.

WILLIAM C. FITTS, Attorney General, for the State. Charge No. 3 omits the word reasonable before the word, hypothesis, and is for that reason bad. The hypothesis must be a reasonable one. See the doctrine laid down in *Webb v. State*, 106 Ala. 52.

Charge No. 27 also ignores the fact that the defendant provoked and brought on the difficulty and that he, with another, went to the abiding place of the deceased, with drawn pistols with express and avowed purpose of having a row. Under no state of after facts can this defendant invoke the aid of the doctrine of self-defense. From the very moment when the defendant appeared in the yard and at the door he was in the very act of a present hostile demonstration.—*Green v. State*, 69 Ala. 6; *Wills v. State*, 73 Ala. 362.

The 32d charge is the general affirmative instruction which was asked on behalf of the defendant, and his counsel insist upon the point in the following way. The indictment describes the deceased as A. M. Palmer, *alias* Amasa Palmer, *alias* Mace Palmer; while the witnesses in detailing their testimony on the stand variously speak of and describe the deceased as "old man Palmer" and as "Ace Palmer." It will doubtless be insisted that there is a variance between the indictment and the proof. There was no controversy about the identity of the person slain, and the point is attempted to be made in this court for the first time, and even if there were merit in it, it comes too late.—*Hinds v. State*, 55 Ala. 146; *Franklin v. State*, 52 Ala. 414; *Lawrence v. State*, 59 Ala. 61.

BRICKELL, C. J.—1. It was matter of irrevisable discretion in the court below, whether, after the selection and organization of the jury, the trial should be suspended, to enable the counsel for the defendant to

[Crawford v. The State.]

examine the minutes of the court, with the view of filing a plea, alleging that the grand jury finding the indictment, was not drawn in the presence of the persons designated by law. If the fact existed, that the grand jury was not so drawn, the irregularity could be reached only by a plea in abatement, which the statute requires shall precede a plea to the merits.—Cr. Code of 1886, §§ 4445-46. Nor was there error in refusing to entertain an oral plea alleging the irregularity. Oral pleas, except the plea of guilty, or of not guilty, delivered in open court, received by the clerk and entered on the minutes, are unknown in our practice. On a previous day of the term, the defendant had been arraigned, and had pleaded not guilty; the plea was an admission of the genuineness of the indictment, precluding all inquiry into the regularity of its finding.—*State v. Matthews,* 9 Port. 370; *State v. Clarkson,* 3 Ala. 378; *Russell v. State,* 33 Ala. 366; *Ex parte Winston,* 52 Ala. 419. Cases may arise in which the irregularity in the drawing of the grand jury, by which we intend the drawing otherwise than in the presence of the officers designated by law (for this is the only defect, or irregularity, which the statute renders available to a defendant), is not known until after the plea of not guilty has been interposed. In such cases, on a proper application seasonably made, it may be the duty of the court to permit the plea of not guilty withdrawn, and a plea in abatement filed.—*Russell v. State, supra; Nixon v. State,* 68 Ala. 535. The defendant made no application to withdraw the plea of not guilty; no positive affirmation that in point of fact, the irregularity in the drawing of the grand jury existed. The application had an appearance of dilatoriness, not commending it to judicial favor.

2. While there is a broad distinction between the quantity of evidence necessary to support a conviction in criminal cases, and that which will support a verdict in civil cases, the general rules and tests as to the admissibility and relevancy of evidence, are the same in each class of casses.—Wharton Criminal Evidence, § 1. The evidence must be responsive to the issues, and within the issues, it is the duty of the court to confine it.—1 Greenl. Ev., §§ 50-52. Facts and circumstances, which, when proved, can furnish no aid in determining the issue, can shed no light on the transaction, or matter

of inquiry, ought, especially in criminal cases, to be rigorously excluded. Every fact, to which evidence is offered, may, in itself, become the subject of controversy; and, if controverted, opposing evidence must be heard. If the evidence was not limited—if there was no rule or principle respecting its admission or exclusion—perplexing inquiries as to collateral or irrelevant facts would constantly arise, obscuring the real issue, confusing the minds of the jury, and embarrassing trials and the administration of justice. Parties would be oppressed, and would often suffer grievous wrongs, for it cannot be supposed that they come prepared to meet any other evidence than such as is material, relevant to the issues.—*Redd v. State,* 68 Ala. 492; *Whitaker v. State,* 106 Ala. 30.

We have been induced to this statement of general, elementary principles, because of the latitude which was given the evidence on the trial, and because the exceptions reserved to the rejection of evidence indicate the greater latitude the defendant insists should have been given it. There can be no doubt of the correctness of the rulings of the court touching the examination of Williamson as to the illicit sexual relations which had existed, or were existing, between him and Alice Palmer. There was no aspect or phase of the case, in which evidence of such relations was admissible; and we deem it proper to say, that on a future trial all such evidence—all facts and circumstances having no other tendency than to prove such relations—should be carefully excluded. Directed as it is, against two of the material witnesses for the State, present when the homicide was committed, it is pernicious in its tendencies, and may be pernicious in its effects. Offensive as these relations may have been to the law, and to the moral sense of the community, they afforded neither justification nor excuse to the defendant and his companions, for the wrongful entry of the house of the woman, with arms, in the night-time; and if she were suing them for the trespass, evidence of these relations, and that the purpose was to put an end to them, would not be admissible as matter of justification, or in mitigation of damages.—6 Wait's Actions & Defenses, 86; *Love v. Moynehan,* 16 Ill. 277; *Perkins v. Towle,* 43 N. H. 220; *Weston v. Gravlin,* 49 Vt. 507. The law appointed the

remedies for the prevention of the continuance of the relations, and for the public offense which had been committed; and to these remedies there should have been resort, if redress of the public wrong was sought. The citizen may not take the law into his own hands, for the redress of real or suspected public wrongs.

3. Nor was the evidence admissible to discredit, as witnesses, either Williamson or Alice Palmer. Evidence that either was of general bad character, or of bad character for truth and veracity, was admissible for the purposes of impeachment.—*Ward v. State,* 28 Ala. 53. While this is true, it is equally true, that particular, independent facts, though bearing on the question of veracity, cannot be put in evidence for the purpose of discrediting them.—Whart. Cr. Ev., § 476; 1 Greenl. Ev., § 461; *McQueen v. State,* 108 Ala. 54; *Thompson v. State,* 100 Ala. 70; *Moore v. State,* 68 Ala. 360. There has not been, perhaps, more frequent application of this rule, than when it has been sought to assail a female witness because of the badness of her reputation for chastity.—*Holland v. Barnes,* 53 Ala. 83; *Motes v. Bates,* 80 Ala. 387; *Birmingham Un. Rwy. Co. v. Hale,* 90 Ala. 8; *McInerny v. Irvin, Ib.* 275; *Rhea v. State,* 100 Ala. 119; Whart. Cr. Ev., § 486.

4. It is quite an error to suppose, that these witnesses could be cross-examined as to these relations, with the view of contradicting, and thereby discrediting them, if the relations, or the facts and circumstances tending to prove them, were denied. While a great latitude of interrogation is permissible on cross-examination, it is, as observed by Mr. Greenleaf, "a well settled rule that a witness *cannot be cross-examined as to any fact, which is collateral and irrelevant to the issue,* merely for the purpose of contradicting him by other evidence, if he should deny it, thereby to discredit him. And, if a question is put to a witness which is collateral or irrelevant to the issue, his answer cannot be contradicted by the party who asked the question; but it is conclusive against him."—1 Greenl. Ev., § 449; Whart. Cr. Ev., § 484; *Ortez v. Jewett,* 23 Ala. 662; *Blakey v. Blakey,* 33 Ala. 611; 3 Brick. Dig. 828, § 101. This rule, that there shall be no contradiction of a witness in reference to matter wholly collateral to the main issue, it is obvious, is of infinite importance in trials before a jury.

If there be such contradiction of a single witness, there may be of every other witness upon the stand, and an indefinite number of mere subordinate, collateral issues raised, dependent on testimony, not the subject of indictable perjury, prolonging trials, and distracting the attention of the jury from the main issue on which they are to render verdict.

5. There was no error in excluding the evidence touching Williamson's concealment, or efforts to conceal himself, when the officers of the law and others came to the house after the homicide had been committed. This evidence formed no part of the *res gestae*; the homicide was then an accomplished fact. Williamson was not its perpetrator; nor had he aided or abetted in its perpetration. It is true, that one accused of crime may show his innocence by proof of the guilt of another, and if it was unknown by whose act the death of the deceased was caused, and the ascertainment of the fact was dependent on circumstantial evidence, this conduct of Williamson, as the flight of one suspected or accused of crime, or the concealment of himself, are criminating circumstances, may or may not have been admissible, because of its tendency to criminate him. However that may be, the evidence is uncontroverted that the death was caused by a No. 38 pistol ball, and that the defendant presented and fired at the deceased a pistol, carrying a ball of that size. In the presence of this evidence, the conduct of Williamson, subsequent to the homicide, is wholly irrelevant and immaterial. It can shed no light upon the prior conduct of the defendant, or of his companions, nor upon any inquiry involved in the real issue, The error of the court was, not in the exclusion of the particular evidence to which exceptions were taken, but in the reception of any evidence touching Williamson's conduct subsequent to the homicide. In this connection, must be taken the evidence that he remained at the house during the night, and the reasons for his remaining. The fact that he remained, and all that he did in the taking care of the body of the deceased, are minor, incidental facts, parts of the history of the homicide, to which he may testify; in themselves, they are of but little significance, except as proof of the death. Whether he fired, or did not fire his pistol, while going to the house, before the homicide, is a collateral fact,

[Crawford v. The State.]

with an inquiry into which the jury should not be burdened.

6.  Whether Thomas Palmer should be recalled and re-examined with the view to his contradiction, was matter of discretion in the court below, and the exercise of the discretion is not revisable on error.—*Louisville & Nashville Railroad Co. v. Barker,* 96 Ala. 435; *Richmond & Danville Railroad Co. v. Vance,* 93 Ala. 144; *Thompson v. State,* 100 Ala. 70.

7.  The receipt the defendant had given Alice Palmer, in satisfaction of the mortgage she had executed to Howle was admissible in rebuttal of the evidence, that his purpose in going to her house on the night of the homicide, was to see her about the mortgage, or any of the property embraced in it.—*Evans v. State,* 109 Ala. 11.

8.  The ball which was said to have been extracted from the body of the deceased, and that which was said to have been taken from the house, were properly permitted to go the jury.  Whether the balls produced were identified as the balls taken from the body of the deceased and from the house, was matter for the consideration of the jury.  There was, to say the least, evidence tending to identify them.

9.  Ward having testified that the general character of Alice Palmer and of Williamson was bad, and that their character for truth and varacity was bad, it was error to reject the question propounded by defendant, whether from his knowledge of Williamson's character, he would believe him on oath.—Whart. Cr. Ev., § 486, and authorities cited in note.  Such has been the usual course of examination in this State; it is conceded to be the course in England, and as is properly said in *Hamilton v. People,* 29 Mich. 186, the propriety of it was never questioned, until Mr. Greenleaf, (1 Green. Ev., § 461), expressed the opinion that the American authorities disfavored the English rule; an opinion not supported by the authorities to which he refers: *Hillis v. Wylie,* 26 Ohio St. 574; *State v. Caveness,* 78 N. C. 484.

10.  The evidence having been closed, as the bill of exceptions recites,  "Before the argument began, the court limited the argument to the jury to one and one-half hours to each side, and refused to allow defendant's counsel a longer time for argument to the jury than one

and one-half hours;" to which action of the court an exception was reserved. The constitution declares "that in all criminal prosecutions, the accused has a right to be heard by himself and counsel, or either." Wherever a like constitutional provision prevails, it is the uniform course of judicial decision, that in criminal prosecutions, upon all matters or questions of fact triable by jury, the accused or his counsel must be heard; and that the court, whatever may be the opinion it entertains of the clearness, weight, or conclusiveness of the evidence, cannot deny or withhold the right. But it is generally, if not universally conceded, that the court has, and of necessity must have, a discretion in regulating the exercise of the right; or otherwise, without benefit to the accused, it might be abused, and perverted into a hindrance or obstruction to the administration of justice. The discretion is not irrevisable; it is subject to revision in a higher tribunal, and if it appears that it was not justly, prudently exercised, there would be a reversal of the judgment of conviction.—*Yeldell v. State,* 100 Ala. 26. This case is republished, 46 Am. St. Rep. 20, accompanied by an elaborate note by Mr. Freeman, in which the authorities are collected, and the subject discussed exhaustively. The discretion is not mere power to be exercised because it exists; nor is it to be exercised capriciously or arbitrarily; and in its exercise, it should always be born in mind, that it is a high constitutional right of the accused, it is proposed to regulate.—Cooley Con. Limitation, 409. There can be no fixed, defined rule announced; each particular case must rest on its own peculiar facts and circumstances. That which in one case would be a reasonable limitation, in another, might be unreasonable, unjust, working injury to the accused. The number of the witnesses examined, the character of the evidence, the time consumed in the trial, the duration of the term of the court, and other matters, should be deliberately considered. In the present case, not computing witnesses as to character only, the State examined eight witnesses, and including his own examination, the defendant examined fourteen. It cannot be said the facts are unusually complicated or involved; or that there is unusual conflict in the evidence, as to material, relevant facts. Nor does it appear that in argument, counsel for the defendant occupied the time allotted to

[Crawford v. The State.]

them; or that having occupied it, they requested an extension of time, in order to present fully the case of the defendant. If it were shown affirmatively, that keeping within the boundaries of legitimate argument, the time had been occupied, and there had been a refusal to extend it, the extension having been claimed as necessary to the full defense of the defendant, a different question would be presented, upon which an expression of opinion is not necessary.—*Dille v. State*, 34 Ohio 617; s. c. 32 Am. Rep. 395; *Wingo v. State*, 62 Miss. 311. We have before us a mere general exception to the order of the court made in advance of the argument, without the statement of any fact indicating that the counsel for the defendant did not find the time allotted sufficient for all the purposes of a full defense. The rule is general, that error must be affirmatively shown—it cannot be presumed; we cannot say the defendant suffered injustice by the limitation of the argument.—*Kizer v. State*, 12 Lea, (Tenn.) 564; *Williams v. Commonwealth*, 82 Ky. 644.

11. It was proper to restrain the counsel of the defendant from the proposed argument to the jury, that the failure of the State to examine Boman as a witness, was a circumstance for their consideration. The argument was not legitimate whether applied to the State or to the defendant, and with equal propriety, if there had been propriety in it, it could have been applied as well to the one, as to the other. Boman was in court, as accessible to the one party as to the other; and all that can be properly said, is, that neither party deemed it necessary to place him on the stand, adding his testimony to that which had been adduced.—*Bates v. Morris*, 101 Ala. 282; *Jackson v. State*, 77 Ala. 18.

12. There are twenty-one exceptions to the refusal of instructions requested by the defendant. We do not propose to consider these instructions in the order in which they appear in the bill of exceptions, but as far as practicable to consider them in reference to the particular subjects they involve. The general affirmative instruction, that if the evidence was believed, the jury must find the defendant not guilty, was requested and refused. The argument in support of the instruction is, that there was no evidence proving the name of the deceased as laid in the indictment—or rather, that the only evidence was of a name variant from that charged.

[Crawford v. The State.]

The evidence of the name was very slight and does not seem to have been adduced for the purpose of identifying the deceased. An indictment for homicide, "must be so certain as to the party against whom the offense was committed, as to enable the prisoner to know who that party is, and what charge he is called on to answer." Whart. Hom., § 796. The prosecutor must prove the name; and at common law, a variance in the name, or identity of the party, entitled the prisoner to an acquittal, though the acquittal was not a bar to a subsequent indictment, stating the name correctly, or if that was unknown, otherwise identifying the deceased.—Whart. Hom., § 801. The statute authorizes an amendment of the indictment in this respect, by the consent of the defendant; if he will not consent, he is not entitled to a verdict of acquittal, but the prosecution may be dismissed and a new indictment preferred.—Cr. Code of 1886, §§ 4389-90; *Page v. State*, 61 Ala. 16. On another trial, there will be, doubtless, fuller evidence of the name of the deceased, and we pass the further consideration of this instruction.

13. It was not essential to a conviction of the defendant, as is asserted in one or more of the instructions, that it should be shown he and Evans acted jointly in the commission of the homicide. If the defendant alone committed the homicide; if Evans did not aid or abet in its commission, there could be properly a conviction of the defendant, as if he alone were indicted. Offenses of this character are several as well as joint; and one defendant may be acquitted, and another convicted; or one may be found guilty and subjected to severer punishment, than may be visited on another, who is also found guilty.—Whart. Cr. Pl. & Pr., §§ 312-14; 1 Bish. Cr. Pr., §§ 463-476; 9 Am. & Eng. Encyc. of Law, 645, §.8.

14. In all criminal prosecutions, whether of felony or misdemeanor, the accused may give evidence of his previous good character, having reference and analogy to the subject of the charge, not only when on the other evidence a doubt of guilt exists, but even to generate such doubt. While this is true, instructions to a jury should not single out, or dissociate from the other evidence, the evidence of good character. The verdict of the jury ought to be based on the entire evidence; and when the good character of the accused is proved, it is

for the jury to pronounce, whether considering it in connection with the other evidence, there is reasonable doubt of guilt.—*Paul v. State*, 100 Ala. 136 ; *Goldsmith v. State*, 105 Ala. 8 ; *Scott v. State*, *Ib.* 57. . The instruction requested was so framed as to dissociate the evidence of good character from the other evidence, and was properly refused.

15.   The fact that a witness out of court, or upon a former examination, has made statements, as to a material fact, variant from his testimony on the trial, affects his credibility ; the extent to which it is affected, it is the province of the jury to determine ; and it may be proper for the court so to instruct the jury.   The instructions on this point which were requested are faulty in several respects.   The first asserts, or rather raises as matter of inquiry, the fact that one or more of the witnesses for the State, on a former investigation of the case, had made statements variant from the evidence delivered on the trial.   We find in the record no evidence of such contrariety of statement on a former investigation of the case, and the absence of such evidence rendered the refusal of the instruction proper.   Instructions must be based on the evidence ; and an instruction requested, raising an inquiry as to matter of fact, of which there is no evidence, is erroneous.   This instruction is in another respect faulty ; it does not predicate that the contrariety of statement was in reference to a material fact.   "It is not every contradiction of a witness which has the effect to impeach.   The contradiction must be on a material point."—*Cauley v. State*, 92 Ala. 71.   The other instruction, so far as it relates to this point, is subject to the objection that it does not confine the supposed impeachment of the witnesses for the State to facts material.   It is also an invasion of the province of the jury.   Witnesses may be impeached because of bad character ; or by disproof of their testimony in some material particular, or as to some material fact ; or because of the contrariety of their statements ; but they are not absolutely discredited.   The jury may find much in their evidence to credit, and it is their province to determine, in view of all the evidence, the witnesses whom they will credit or discredit ; or the parts of the testimony of any witness they will credit or discredit.—*Grimes v. State*, 63 Ala. 166 ; *Moore v. State*, 68 Ala. 360 ; *Childs v. State*, 76 Ala.

93 ; *Jordan v. State*, 81 Ala. 20 ; *Harris v. State*, 96 Ala. 24.. The instruction would most probably have impressed the jury with the idea that the impeachment of one or more of the witnesses for the State absolutely discredited them. Beside, the reasonable doubt, to the benefit of which a defendant is entitled, must spring from a fair, deliberate consideration of all the evidence, and it would be essentially wrong for the court to say to the jury, that a particular fact, dissociated, disconnected from all other evidence, may or would generate it. · Such an instruction would be directed to the effect and sufficiency of the evidence, and calculated to divert the attention and consideration of the jury from all other than the particular evidence to which it referred.—*Jordan v. State,* 81 Ala. 20.

· 16. The instruction requested, that "unless the evidence against the defendant should be such as to exclude to a moral certainty every hypothesis but that of his guilt, the jury must find him not guilty," is substantially, if not literally, an instruction which was approved in the two cases, *Riley v. State*, 88 Ala. 188 ; *Riley v. State, Ib.* 193. It is the form of instruction which prevailed in our courts for a long time. The more recent decisions have pronounced it erroneous, because of its want of precision and of its tendency to mislead the jury. It is not every hypothesis of innocence, reasonable or unreasonable, possible or imaginary, the evidence must exclude ; but only such hypotheses as are *reasonable*, springing from a consideration and comparison of the entire evidence. ˙ The former decisions approving the form of instruction before us are not regarded as authoritative, and many of them have been expressly overruled.—*Garrett v. State*, 97 Ala. 18 ; *Webb v. State,* 106 Ala. 52.

17. Two instructions requested and refused, relate to threats against the defendant shown to have been uttered by the deceased. The difference in the instructions is, that the one is silent as to the communication of the threats, and the other, conforming to the evidence, predicates that they were not communicated to the defendant until after the homicide. · Each asserts that the jury may look to or consider such threats, to aid them in determining who was the aggressor in the difficulty terminating in the homicide, thereby to generate a doubt of the guilt of the defendant. . Without considering whether

[Crawford v. The State.]

the case presents any of the categories or conditions in
which evidence of threats communicated, or uncommu-
nicated, is admissible, or if such evidence is received,
whether it should exert any influence on the finding of
the jury, for obvious reasons, these instructions were
properly refused.   Any instruction singling out a partic-
ular fact, or a particular defensive theory, and which
invites the jury to base the verdict on that fact or theory
alone, should be refused.   The tendency of such an
instruction is, the concentration of the attention and
deliberations of the jury upon the particular fact or
theory, to the exclusion of a fair, just examination of the
evidence in its entirety.   It is an instruction, in its last
analysis, upon the effect and sufficiency of the evidence,
which should be avoided.—*Jordan v. State,* 81 Ala. 20, 33 ;
*Prince v. State,* 100 Ala. 144.

18.   An instruction requested and refused, is in these
words : "If the jury believe from the evidence, that the
deceased was in a house not his own house, and that he
was only boarding there temporarily, and that his house
and where his family resided was at another place, then
he could not be protected as being in his own house."
The homicide was committed in the dwelling house of
Alice Palmer, the daughter-in-law of the deceased, her
husband being in the insane asylum.   In pursuit of his
occupation as a blacksmith, the deceased was working
in the immediate vicinity, and for several weeks had
been living in the house ; his home where his family
resided being some ten or twelve miles distant.   The
purpose of the instruction, interpreted in the light of
the evidence, was to impress the jury with the idea that
the deceased was without legal right to resist and pre-
vent trespasses in and upon the house, or assaults, actual
or menaced, upon himself, or any of its inmates, in the
same manner, and to the same extent to which he could
have made resistance in his own dwelling.   The instruc-
tion was erroneous and was properly refused.   The law
has been long settled, that a guest in a dwelling house
is entitled to the protection the law affords to the owner
or more permanent occupant.   He may repel trespasses
in and upon the house, or repel assaults, actual or men-
aced, as if he was under his own roof and within his own
doors.—1 Bish. Cr. Law, § 877 ; 1 Whart. Cr. Law, §
505 ; *Curtis v. Hubbard,* 1 Hill (N. Y.), 336 ; *People v.*

[Crawford v. The State.]

*Hubbard,* 24 Wend. 369; *Scribner v. Beach,* 4 Denio, 448; *Gordon v. Clifford,* 28 N. H. 416. COWEN, J., said in *Curtis v. Hubbard, supra*: "The defendant was a mere guest, yet he was there on a visit to his brother's house, and might on this ground, without his brother's request, have interposed and prevented the sheriff from violating the house in any way. *Pro hac vice,* it was his own home." In *Gordon v. Clifford, supra,* it is said: "The effect of the decisions seem to be, that all who have for the time being a legal domicile in the house, all who have a right to remain in it, will be protected." In the section to which reference is made, Mr. Bishop declares as the true doctrine, "that whatever one may do for himself, he may do for another. The common case, indeed, is, where a father, son, brother, servant or the like protects by the stronger arm, the feebler. But a guest in a house may defend the house; or the neighbors of the occupant may assemble for its defense; and on the whole, though distinctions have been taken, and doubts expressed, the better view plainly is, that one may do for another whatever the other may do for himself." It is not within the limits or scope of the instruction, to consider the degree of force the deceased could rightfully employ in the resistance and prevention of a trespass in and upon the house, or in repelling an assault, actual or menaced. The house was not defenseless, nor dependent wholly on the defense its permanent occupant was capable of making. The deceased was there rightfully, and had the legal right to defend it and its inmates, not resorting to greater force than the necessities of the defense required; and it is a denial of this right the instruction involves.

19. The remaining instructions, in varying forms, invoke for the defendant a plea of self-defense. The instruction numbered 25, asserts the proposition that if the defendant was *reasonably free from fault* in bringing on the difficulty he could successfully invoke the plea. The instruction marked C. commingles this proposition with other propositions. This court has strenuously insisted upon, and vigorously enforced the doctrine, that the plea of self-defense is not available to a defendant who is not free from fault in the creation of a necessity to take the life, or to do grievous bodily harm to another.—*Holmes v. State,* 100 Ala. 80. In *Johnson v. State,* 102 Ala. 19, it is said: "This doctrine is too important, too conserv-

ative of human life and of good order, to allow it to be frittered away;'' and this was said in commenting on an instruction predicating the right to self-defense on a reasonable freedom from fault in provoking or encouraging the difficulty. This expression, ''reasonably free from fault,'' had been employed in some of our previous decisions, it may be inadvertently, rather than intentionally. Whatever may be true in this respect, the more recent decisions have corrected the expression, and have settled, as is said in *McQueen v. State*, 103 Ala. 17, that ''the law admits of no qualification of this requirement. The defendant must have been free from all fault or wrongdoing, on his part, which had the effect to provoke or bring on the difficulty.'' There was no error in the refusal of these instructions.

20. The proposition, upon which, it may be inferred, it was intended to base the instructions numbered 6, 18 and 30, is, that the entry of the dwelling, the scene of the homicide, by the defendant and his companions, without force, through the open door, was a mere civil trespass. As it was only a trespass, the deceased could not lawfully repel or prevent it by the use of a deadly weapon, and as for repulsion or prevention, he resorted to the use of such weapon, the right of defendant to defend himself against an attack from the deceased was not lost or forfeited by reason of the wrongdoing in the commission of the trespass. The bill of exceptions purports to contain all the evidence, and a summary of it, so far as it may pertain to or be involved in these instructions, is essential to their proper consideration; distinguishing the evidence which is without conflict, from that which may be said to be matter of controversy or dispute. The facts as shown by the bill of exceptions, about which there does not seem to have been conflict in the evidence, are, that by concert, the defendant and his companions, Evans and Boman, went to the dwelling house in the night time; they gave no notice of their approach, and made no request for permission to enter; and if their purposes were peaceful, of such purposes they made no announcement. The first notice of their presence the inmates of the house had was their appearance in the door, the defendant and Evans having pistols in their hands, openly, visibly. A difficulty ensued in which the deceased lost his life.

The evidence on the part of the prosecution, which may not, as to the occurrences at the dwelling, be harmonious or consistent with the evidence on the part of the defense, tended to show that while there was no breaking or irruption of the house; while the entry was not forcible, it was disorderly, attended by exclamations or salutations not usually accompanying a respectful or friendly entry of a dwelling. The deceased ordering the intruders to make their business known or to leave, the defendant and Evans threw their revolvers in his face, or presented them in shooting distance of his person. Thereupon the deceased seized his gun and pistol, and was slain in the ensuing difficulty. We are not passing on the credibility or sufficiency of the evidence; that lies within the province of the jury. The summary of facts, collected from the bill of exceptions, is intended only to render intelligible the discussion of these instructions.

Precision and definiteness is an indispensable element of instructions to a jury; and instructions requested, wanting in this element, are always properly refused. Thompson Charging Jury, 119, § 89; 1 Brick. Dig. 339, § 59. In *Hughes v. Anderson*, 68 Ala. 280, 286, it was said by Stone, J.: "Charges to juries should be made up of clear and distinct legal principles, without involvement, and free from redundant verbiage or other confusing elements." It is not without indulging much of inference and of argument, that the legal proposition supposed to underlie these instructions may be evolved from them. Whether the jury would evolve it is matter of uncertainty, and of conjecture and speculation. Such instructions are more calculated to confuse and perplex the jury, than to enlighten and aid them in their deliberations. In other respects the instructions are objectionable. They ignore, withdrawing from the consideration of the jury, the time, the manner, and the circumstances attending the entry of the dwelling; and the evidence for the prosecution as to the hostile acts and demonstrations of the defendant and of Evans subsequent to the entry, after they were within the house. These occurrences were the *causa causans* of the tragical result, and the attention and consideration of the jury should not be diverted from them.

It will be observed of the sixth instruction, that it limits the inquiry of the jury to the acts and conduct of

the defendant when he entered the house, diverting attention from his subsequent acts and conduct; and that it disconnects him from his companions, who were with him by concert. The other instructions likewise separate him from his companions and their acts, and direct inquiry to his purposes in going to the house. The occurrences at and in the house are the controlling matters of inquiry, rather than the purposes he may have had in view in going there, which others could know only from these occurrences. The infirmities of these instructions to which we have adverted, necessitated their refusal.—*Goodson v. Pickett,* 78 Ala. 301; *Louisville & Nashville Railroad Co. v. Webb,* 97 Ala. 308; *Wadsworth v. Williams,* 101 Ala. 364.

Passing from the infirmities affecting these instructions, the more important question remains, whether the defendant is in a condition to invoke the plea that the homicide was committed in self-defense. The solution of this inquiry depends more particularly, and primarily, not, as these instructions indicate, upon the acts and conduct of the deceased, but upon the prior acts and conduct of the defendant and his companions. They were the aggressors, the guilty wrongdoers, provoking and inciting the subsequent acts and conduct of the deceased, whatever they may have been, which are supposed to have created the exigency or necessity for the taking of life. The entry of the house, through the open door, may have been a civil trespass, which if it stood alone, not attended by the fact that it was in the night time, by men openly and visibly bearing deadly weapons in their hands, who gave no notice of their approach, made no request for permission to enter, and no announcement of peaceful purposes, could not, in the first instance, have been repelled or prevented by the employment of deadly weapons. The law guards with great jealousy and vigilance the peace and security of the dwelling, extending to it a degree of protection, the equivalent to that extended to the person.—1 Addison on Torts, (Wood's ed.), 398. A trespass upon it, an invasion of its quiet enjoyment, is more than a mere trespass upon property. The deceased was in the house rightfully; for the time being it was his home; and lawfully he could do, for the protection of its peace and security and of its inmates, whatever the more perma-

[Crawford v. The State.]

·nent occupant could have done rightfully. A stranger, or a casual visitor, coming without invitation or permission, for any reasons satisfactory to himself, the occupant of a dwelling may réquire to depart, and if he persists in remaining, may use the necessary force to eject him. The kind and degree of force depends upon the conduct of the intruder.—1 Whart. Cr. Law, § 501; *Com. v. Clark*, 2 Metc. (Mass.) 23; *Pennsylvania v. Robertson*, 1 Addison, 246; *State v. Lazarus*, 1 Mill, (S. C.), 12. In cases like the present, an intruder into a dwelling, armed with a deadly weapon, who does not depart, upon warning, leaves no room for the application of the maxim, *molliter manus imposuit.—State v. Davis*, 80 N. C. 351; *State v. Taylor*, 82 N. C. 554. If the deceased seized his gun and pistol, and warned the defendant and his companions to leave the dwelling, the exigency and necessity for a resort to such weapons was created by the prior exhibition of such weapons, in an apparent condition for immediate use, by the defendant and Evans.

Again, the deceased had the legal right, in defense of the peace and security of the dwelling, or of himself, or its inmates, to prevent the commission of a felony; and for the purposes of prevention and defense, could rightfully employ the necessary force, even to the taking of the life of the aggressor. The deceased and the inmates of the house were without fault; they had not provoked or incited the invasion of the dwelling, and had given no cause of offense to the defendant or his companions. The appearance of the defendant and his companions in the dwelling, in the night time, two of them having· in their·hands· deadly weapons, their coming being unannounced, and their presence and purposes unexplained, may have created in the mind of the deceased, the reasonable belief, well founded and honestly entertained, that their purposes were felonious; that there was imminent peril to him, and to the other inmates of the house, of loss of life or of grievous bodily harm, which could be averted only by the taking of the life of the intruder. Of the existence of these facts, the jury were the judges; if they find them to exist, the killing of the intruders by the deceased, would have been homicide in self-defense.—1 Whart. Cr. Law, § 465; §§ 503, 506; *People v. Flanagan*, 60 Cal. 2; s. c. 44 Am. Rep. 52. In what-

ever aspect or phase the case may be considered, as it is now presented, these instructions were properly refused.

21. The instruction numbered 18½ is objectionable in many respects; it is an invitation to the jury to disregard much of the evidence, as well as that which is free from conflict, as that which may be matter of controversy, and the natural, logical inferences from it; and if it had been given, to prevent it from misleading and confusing the jury, explanatory and additional instructions would have been necessary. The instruction marked A. was properly refused for reasons we have stated in the discussion of the instructions numbered 6, 18 and 30. Beside, it is rather remarkable, that innocence of purpose and freedom from fault should be predicated from the invasion of a dwelling house, in the night time, with an exhibition of deadly weapons, though it may have been the dwelling of a fallen woman, converting it into a scene of boisterous disorder. The instruction marked C. relates primarily to guilt of murder, and, as there was a conviction of manslaughter only, need not be considered.

22. The instructions numbered 16 and 27, may be considered in connection. They are founded on the proposition that though the defendant may have been the aggressor, may have incited and provoked the difficulty, he was withdrawing and retreating from the contest he had created, and while withdrawing and retreating, he was pursued by the deceased, and the pursuit created a necessity for the taking the life of the deceased to save his own, or to save himself from grievous bodily harm. The general rule, that an aggressor, one who provokes or incites a difficulty, cannot excuse or justify himself in taking life, is not of absolute and universal application. An exception to it exists, when in good faith he abandons the difficulty, retires or retreats from it, clearly announcing his desire for peace; then if he be pursued, his right to defend himself is revived.—1 Whart. Cr. Law, § 486; 1 Bishop Cr. Law, § 871; *Parker v. State*, 88 Ala. 4; *Stoffer v. State*, 15 Ohio St. 47; s. c. 86 Am. Dec. 470; Cases on Self Defense, 213. It will be observed, neither of these instructions direct inquiry to the important, controlling fact, without the existence of which the exception to the general doctrine can have no room for operation; and that is, whether

the acts and conduct of the defendant manifested, so clearly manifested that peace was his desire, that to secure it, he had abandoned and was retiring from the contest, removing from the mind of the deceased all reasonable apprehension of a continuance of the difficulty and of the imminent peril in which he was involved. Less than this cannot give rise to the exception, or the assailed would be subjected to the perils of colorable retreats, intended to gain "fresh strength, or some new advantage." The deceased did not pass beyond the door of the dwelling; he was slain at or near the door; and that which is termed pursuit, was the following of the defendant and Evans within the room of the dwelling they had entered. It was his right to follow them, so long as they were within the dwelling with arms in their hands, and the appearances of imminent peril, they created, were continuing. Notes to *Stoffer's Case*; Cases on Self Defense, 231. Without additional instructions, directing the attention of the jury to a consideration of these inquiries, the instruction may have misled them; and as constructed, the instructions do not assert a correct proposition of law.—*Parker v. State, supra.*

We have examined all the exceptions, and the only error we have found is that pointed out in the 9th paragraph of this opinion. The error compels a reversal of the judgment and a remandment of the cause. The defendant will remain in custody, until discharged by due course of law.

Reversed and remanded.