[Cole v. The State.]

# Cole v. The State.

*Indictment for Murder.*

1. *Organization of jury in capital case; when one of the special venire is placed on another jury.*—When one, who is summoned on a special *venire* to try a capital case and whose name was on the list served on the defendant in such case, and while in attendance for this purpose on the day set for the trial, is summoned as a talesman and taken as a juror to try another case, and this jury upon which he was taken is engaged in considering said case when the capital case in which he was summoned on the special *venire* is called, the court may, under the provisions of the general jury law (Acts of 1886-87, p. 156, § 10; Cr. Code, p. 134), without error, proceed to organize the jury in the capital case without such juror.

2. *Same; quashing venire.*—The fact that in the list of jurors served on a defendant in a criminal case the occupation of several of the jurors is indicated by ditto marks under the word indicating the occupation of the juror immediately preceding on the list, or that the names of some of the jurors who were absent or were not found were erased from the list by having a pen mark drawn through them, does not constitute a ground for quashing the *venire;* nor does the fact that the christian names of some of the jurors served upon the defendant were not written out in full, but indicated by initial letters, constitute a ground for quashing the *venire.*

3. *Dying declarations.*—Where, on a trial under an indictment for murder, a witness testifies that the deceased told him "he would die; he could not get well," the statement made by deceased immediately thereafter, and testified to by said witness, that defendant shot him, is admissible in evidence as a dying declaration

4. *Same.*—Statements made by a deceased person are not admissible in evidence as dying declarations, when the only predicate for their admission is the testimony of a witness that at the time such statements were made the deceased "appeared to be suffering very much, was praying to God to help him, and to have mercy upon him."

5. *Voluntary confession.*—A witness in a criminal case, who testifies that he assisted in arresting the defendant and that no threats or promises were made to the defendant, may further testify that in answer to his question, if he shot the deceased, the defendant told him he did ; such confession being shown to have been voluntary.

6. *Admissibility of affidavit to contradict witness.*—An affidavit signed by a witness before a justice of the peace, containing statements relevant to the issue being tried, is admissible to contradict contrary

statements made by said witness when examined on the trial of the case.

APPEAL from the Circuit Court Walker.

Tried before the Hon. JAMES J. BANKS.

The appellant, Bethel Cole, was indicted, tried and convicted for the murder of George Cramer, and sentenced to the penitentiary for life.

The rulings of the court upon the organization of the jury, and the motion to quash the *venire*, are sufficiently stated in the opinion.

John Linehan, upon being introduced as a witness for the State, testified, that on the evening of January 16, 1894, about nine o'clock, he heard some shooting, and went to a house near by and found George Cramer lying in a room wounded. The solicitor asked the witness : ''In what condition was the deceased?'' To which the witness replied : "He was in a bad condition," and described his sufferings. The solicitor then asked the witness : ''What deceased said about dying?'' The defendant objected to this question, and duly excepted to the court's overruling his objection. The witness said that ''Cramer said he would die ; he could not get well.'' The solicitor then asked the witness : " What did Cramer say about who shot him? did he tell you who shot him?'' The defendant objected to this question, and duly excepted to the court's overruling his objections. The witness replied : ''He told me Bethel Cole shot him.''

Upon the introduction of one Jones as a witness for the State, he testified that he went to Cramer shortly after the shooting, and Cramer appeared to be in great pain. The witness was then asked : ''Did Cramer say anything about dying? was he dying?'' The court sustained defendant's objection to this question, and the solicitor then asked the witness : ''What was Cramer's condition?'' The witness answered : ''He appeared to be suffering, was praying.'' The court then asked the witness : ''What did he say about dying, if anything?'' The witness replied : ''Yes, he said he was in pain, appeared to be suffering very much, and was praying God to help him, and have mercy upon him.'' To this question and answer thereto the defendant duly and separately objected, and separately excepted to the court's overruling each of his objections. The witness was then asked by the

solicitor: "What did Cramer tell you about who shot him?" The defendant objected to this question, and duly excepted to the court's overruling his objection. The witness replied: "Cramer told me that Bethel Cole shot him, that he fired through the window, that he saw him when he fired."

One E. W. Gass, a witness for the State, testified that he assisted in arresting the defendant after he broke loose from the marshall, just after his preliminary examination. The witness was then asked: "If the defendant told him anything about killing Cramer?" Upon defendant's objection to this question being sustained, the solicitor asked the witness: "If he made any promises or threats to defendant, or if any promises or threats were made by any one else in his presence or hearing?" The court overruled the defendant's objection to this question, and the defendant duly excepted. The witness replied: "No, sir!" Thereupon the witness was asked: "State what the defendant told you about shooting Cramer?" The defendant objected to this question, and duly excepted to the court's overruling his objection. The witness answered: "I asked him if he did the shooting, and he said yes." "I asked him what for, and he said I had it to do."

Matt Brown, a witness for the defendant testified that he stayed with the defendant the night he was shot; that he heard the shots, and that at that time the defendant was in bed in his, defendant's, house, and that the defendant and witness had been in bed some time. In response to a question by the solicitor, the witness Brown said that he had not told Captain Thomason or any one else "that he was at Bethel's house when Bethel came in on the night of the shooting, and that Bethel came in about five minutes after the shooting took place." The solicitor then asked the witness: "If he had not made an affidavit before a justice of the peace," relative to the killing of Cramer by defendant, at the same time showing the witness a paper writing. The witness denied that he had done so. Thereupon the solicitor, against the objection and exception of the defendant, read said paper writing in the presence of the jury, which was signed and sworn to by the witness, Matt Brown, before the justice of the peace, and in which the witness said that "I was in the house and heard the

[Cole v. The State.]

shooting, and five minutes Bethel Cole came in." Upon being shown his signature to this affidavit he said that it was his, but that he did not know the contents of the paper when he signed it. The justice of the peace, before whom the affidavit and the declaration of the witness Matt Brown were made, was introduced, and testified that he wrote the affidavit and declaration of the witness, Matt Brown, and after he had written it, read it over to the witness, and said Matt Brown signed it and swore to it in his presence. There were other witnesses introduced who corroborated these statements of the justice of the peace. The solicitor then offered the affidavit in evidence, for the purpose of contradicting the witness, Matt Brown. The defendant objected to the affidavit being introduced in evidence, and duly excepted to the court's overruling his objection.

H. L. WATLINGTON, for appellant.

W. C. FITTS, Attorney-General, for the State.—1. The objection to the court proceeding to organize the jury in the absence of the juror Wright, who was engaged in the trial of another cause, is without merit.—*Kimbrough v. State*, 62 Ala. 248; *Shelton v. State*, 73 Ala. 8; *Evans v. State*, 80 Ala. 4.

The rulings of the court upon the introduction of the dying declarations were without error.—*Blackburn v. State*, 98 Ala. 64; *Ward v. State*, 78 Ala. 441; *People v. Garcia*, 63 Cal. 19.

HARALSON, J.—1. The juror, Wright, was one of the number summoned specially to try this case, and his name was on the list which was served on defendant for his trial. While in attendance for this purpose, he was summoned by the sheriff and was taken for the trial of another cause, of the nature of which we are not informed. The jury on which he was placed was out, at the time this case was called. The court asked the defendant, if he waived his right to the juror, but he refused to do so, and claimed the privilege of having said juror for the trial of his cause. The court proceeded to organize the jury without him, against the objection and exception of defendant; and in this there was no error.—*Kimbrough*

*v. The State*, 62 Ala. 248; *Redd v. The State*, 69 Ala. 256; *Shelton v. The State*, 73 Ala. 8.

The case of *Evans v. The State*, 80 Ala. 4, is not in conflict with this ruling. The statute under which the jury in that case was organized, as there construed, required a separate, and distinct *venire* for each capital case, if more than one was set for trial on the same day. The statute under which the jury in this case was organized, different from that, requires not less than 25, nor more than 50, special jurors *for each capital case* that may be set for the same day, and these, "together with the panel of petit jurors organized for the week, shall constitute the *venire* from which the *juries* to try said capital case or *cases* shall be selected." (Acts of 1887, § 10, p. 156; Cr. Code, p. 134.) Here but one *venire* is required, though there may be more than one such case set for trial on the same day.—*Chamblee v. The State*, 78 Ala. 466.

2. The defendant moved to quash the *venire*, on the ground, that all the jurors drawn and summoned for his trial were stricken from, and were not on, the list of jurors served on him, and because the list fails to show the residences of any or all of said jurors. The record shows, that thirty persons were drawn and summoned for the third week of the term, and all were summoned except three, whose names are given and they were returned not found, and one of those summoned, did not appear. The proof showed, that the list served on the defendant as the *venire* for his trial, contained the thirty names, drawn for the third week, with the three marked, not found, and one other, who was absent, (for there were 26 present) with a pen mark run through their names, showing plainly enough, they were not on the *venire*. The three marked not found, were 1, 2 and 3 on the list, and the absent one was 10. Opposite No. 1, was written "Beat Nine," as the juror's place of residence, followed by the word, "farmer," to indicate his occupation. Then came, on the next line, the name of the juror numbered 2, followed by the words, "Beat Nine," and under the word "farmer," on the line above, to indicate his occupation, was a ditto sign made thus : " ,, " ; and so of Nos. 3 and 10, and of all, down to No. 23, and that juror's occupation was written as being that of a merchant. At the end of each of the three lines containing the names of Nos. 1, 2 and 3, were the words,

"not found," and these words were omitted, at the end of the line containing the name of No. 10. All four of these names had a pen line drawn through them, from one end of the line to the other, leaving the names of 26 special jurors, who were present, on the *venire*. This was a poor way for a clerk to make out a list of jurors to be served on a defendant. It would be better to write out the occupations of the jurors, and not indicate them by such signs as that employed in this instance, and not to have the list contain erased names. It ought to be a neat, legible, unscratched document, about which nothing is left in doubt. We hold, however, that the erasure of these names, and the signs employed to indicate the occupations of the jurors, indicated plainly enough what they were used for, and the defendant and his counsel were not misled thereby. The objection is technical, but not meritorious.—*Jones v. The State*, 104 Ala. 30. The same thing may be said of the next objection to the *venire*, that the Christian names of a number of the jurors were not written in full, but indicated by initial letters.—Code, § § 4314, 4322.

3. Before the dying declarations of deceased were made to Linehan, by whom they were proved, deceased stated to the witness, that "he would die; he could not get well"—and after telling him, twice, that he could not get well, stated that "Bethel Cole [the defendant] shot him." There was no error in the admission of this evidence. It indicated he believed himself to have been fatally injured.

4. The declarations to the witness, Jones, were admitted upon no other predicate, than that deceased appeared "to be suffering and was praying; * * * that he said he was in pain, appeared to be suffering very much, was praying to God to help him, and to have mercy upon him." We have ruled so often on the subject of dying declarations, to show that they are not admissible, alone, upon such a predicate as here laid, we will not repeat the rulings.—*Justice v. The State,* 99 Ala. 181; *Blackburn v. The State*, 98 Ala. 65.

5. There was no error in the admission of the confession as made by defendant to the witness Gass. A sufficient predicate was laid therefor.

6. There was no error in allowing the affidavit of Brown to be introduced in evidence to contradict his

evidence on the trial. The two statements were in direct conflict.

For the error pointed out the case must be reversed and remanded.

Reversed and remanded.

