53 So.2d 340

## THOMAS v. STATE.

6 Div. 177.

Supreme Court of Alabama.
June 14, 1951.

634

Jack McGuire, Tuscaloosa, for appellant.

Si Garrett, Atty. Gen., and M. Roland Nachman, Jr., Asst. Atty. Gen., for the State.

BROWN, Justice.

■ Neither the statute, § 1, Gen.Acts 1943, p. 423, Code 1940, Tit. 7, § 827(1), nor Rule 48 of Supreme Court Practice supplementing the statute, contemplate that the original transcript of the testimony and incidents of the trial made by the court reporter from the stenographic notes shall be embodied in the record on appeal. That transcription serves its purpose when it is completed and filed with the clerk of the court within the time prescribed, "within a period of 70 days from the date of trial or date on which motion for new trial shall have been acted upon by the court", duly authenticated by the reporter's certificate as to its correctness and that notice thereof has been given by the reporter to the parties or their attorneys of record. Code of 1940, Tit. 7, p. 137, Pocket Part; Rule 48, Supreme Court Practice.

■ The rule and the statute contemplate that the clerk of the court shall copy said original transcription, the verification thereof and any objections made thereto and the ruling of the Judge thereon and all other original papers filed in said case, together with the minutes and judgment, and verify the same by his certificate under the seal of the court, and as so verified such transcript constitutes the record on appeal. Code of 1940, Tit. 7, §§ 767, 768, 769.

■ The contention of the attorney general that the transcript of the record in this case is irregular and can be considered only to review "the record proper" because the certificate of the court reporter appears in the record as transcribed by the clerk and is not the genuine signature of the court reporter, is without merit. Chapman v. State, 249 Ala. 30, 29 So.2d 286; West v. Givens, 246 Ala. 395, 20 So.2d 710. In the cases cited there was noncompliance with the rule and the statute by failure of the reporter to place his certificate on the original transcription of the testimony and file it with the clerk. Hence it did not become a part of the files to be transcribed by the clerk of the court as a part of the record on appeal.

■ This appeal is by the defendant from a judgment of conviction of murder in the second degree and a sentence to the penitentiary for life entered following his second trial under the indictment for murder in the first degree. Such punishment, if the facts in the case warranted the defendant's conviction, was within the discretion of the jury. Miller v. State, 54 Ala. 155; Scott v. State, 211 Ala. 270, 272–273, 100 So. 211.

The judgment entry recites: "This day comes J. Monroe Ward, as Solicitor who prosecutes for the State, and comes also the defendant in his own proper person and by attorney in open court. The Solicitor, who prosecutes for the State, and the defendant's attorney in open court having agreed that the defendant was heretofore tried under the indictment herein and a verdict of conviction of Murder in the Second Degree rendered, the verdict having been set aside and a new trial granted that by operation of the law the defendant has been acquitted of Murder in the First Degree; that the defendant is now being put to trial for Murder in the Second Degree under the indictment herein, and the defendant having heretofore been duly arraigned on March 14, 1949, and having on that day plead not guilty and not guilty by reason of insanity comes now also in his

own proper person and by attorney. Thereupon came a jury of twelve good and lawful men, towit: * * *."

The second trial was entered upon without following the usual and correct practice of rearraignment of the defendant, explaining to him the effect of the verdict on the first trial and his right to plead acquittal of murder in the first degree. Stephens v. State, 254 Ala. 50, 46 So.2d 820; Howard v. State, 165 Ala. 18, 29, 50 So. 954; Crawford v. State, 112 Ala. 1, 17, 21 So. 214; 8 R.C.L. p. 107, § 70; 8 R.C.L. p. 108, §§ 72–74. "When the defendant in a felony case is arraigned he is brought to the bar to plead in person, and it is quite generally held that a plea by his attorney will be considered a mere nullity, except a plea of not guilty—which plea cannot injure his client. * * *." 8 R.C.L. p. 109, § 74; Note: 13 L.R.A.,N.S., 814; 14 Am.Jur. p. 939, §§ 249, 259.

If the scope of the indictment has been changed by amendment or otherwise, the defendant should not be put on trial without rearraignment. 14 Am.Jur. p. 941, § 253. If the accused fails to plead *autrefois acquit* as to murder in the first degree, he waives his immunity from a second prosecution for the higher offense. 14 Am. Jur. p. 945, § 261; Stephens v. State, 254 Ala. 50, 46 So.2d 820.

While there is apparent conflict in our cases as to the effect of granting a motion for new trial by the trial court, see Reynolds v. State, 1 Ala.App. 24, 55 So. 1016; Savage v. State, 12 Ala.App. 116, 68 So. 498, the weight of authority and the best considered opinions hold that where there is a trial on the merits under a valid indictment for murder in the first degree and a new trial is granted on appeal or on motion for new trial, the conviction for a lesser offense embraced in the indictment furnishes the basis for a plea of *autrefois acquit* of the higher offenses, if pleaded on a subsequent trial. Stephens v. State, supra; Berry v. State, 65 Ala. 117; Ex parte Spivey, 175 Ala. 43, 57 So. 491; Fields v. State, 52 Ala. 348; Mitchell v. State, 60 Ala. 26; Smith v. State, 68 Ala. 424; De Arman v. State, 71 Ala. 351;

Sylvester v. State, 72 Ala. 201; State v. Standifer, 5 Port. 523; 6 Alabama Digest, Criminal Law, ⊙1931½, page 118.

The statute provides and the law contemplates that all pleas in criminal cases, except pleas of guilty, not guilty, and not guilty by reason of insanity be in writing and filed by the clerk of the court. Pleas of guilty and not guilty and not guilty by reason of insanity may be pleaded orally or in writing. Code of 1940, Tit. 15, § 278 et seq.; Crawford v. State, 112 Ala. 1, 21 So. 214.

The statute requires that the defendant be arraigned and be advised by the court as to the nature and substance of the charge against him and, in cases of indictment for charges of felony, that the defendant be called on to plead in person. Howard v. State, 165 Ala. 18, 28, 29, 50 So. 954; Code of 1940, Tit. 15, §§ 278–288.

Where, as here, the legal effect of the indictment has undergone a change by reason of the defendant's previous trial, the better practice would be to rearraign the defendant and call on him to plead before the selection of a jury for his trial under the indictment. Linnehan v. State, 116 Ala. 471, 22 So. 652. The statute does not except a plea of not guilty by reason of insanity for which provision is made by §§ 423, 424, Tit. 15, Code of 1940; Tit. 15, §§ 278–288, p. 461, Form 10. The general practice of the nisi prius courts has long been to allow such plea to be interposed orally and entered of record with the plea of not guilty on arraignment. Garrett v. State, 248 Ala. 612, 29 So.2d 8.

The evidence is without dispute that appellant was regularly employed by Johnnie Wheat, a lumberman, a person other than Jack Wheat alleged in the indictment to have been killed by the appellant. The appellant had a room in the home of Georgia Crim at 1415 15th Street in Tuscaloosa, Ala., in the sawmill district, where he had lived for four years. The evidence shows that the house was what is ordinarily referred to as a "shotgun house", in the Negro residential district, consisting of three small rooms of about the same size, in juxtaposition one after the other.

The appellant's bedroom was the first room, with a single door which faced 15th Street, in which were two beds, one occupied by appellant, at the side of which was a dresser which the defendant used. The other bed on the morning of December 6, 1948, was occupied by some of the children of the family of Georgia Crim. The next and middle room was occupied by Georgia Crim and the back room was used for kitchen and dining room. The evidence shows that the defendant Thomas, who had been on the road with a load of lumber or timber, reached his bedroom about 2 A.M., December 6, 1948, had retired and was asleep when the deceased appeared on the scene, before daylight.

The deceased, as the evidence shows, was and had been for a number of years in the short loan business and had made a loan to the defendant of twenty dollars on which, as the evidence goes to show, he had made no payments, and Wheat, the deceased, had been searching for him and had made threats to kill the "black s. o. b. when he found him." These threats had been communicated to the defendant.

On the morning of the rencounter at the home of Georgia Crim the deceased left his home in the early morning with a number of accounts of like character, among others one against Annie May Crim, whose residence was endorsed on her card as 1415 15th Street. Deceased went to the address, as above stated, before daylight, armed with a pistol, rapped on the door, aroused Georgia Crim and asked if Alfred Thomas was in, or was there. Georgia asked who was making the inquiry and was informed by the deceased, that it was "Mr. Wheat." Georgia woke the defendant and told him that Mr. Wheat wanted to speak to him and Thomas got up in his night clothes and went to the door and "just kind of half cracked the wooden door open, and Wheat said to Alfred, 'Come out. I want to talk to you.' So Alfred spoke, he said, 'I can't come out. I am in my night clothes. I can't come out.' He said, 'Well, what do you want?' He said, 'When are you going to bring my money up there,' like that. He said, 'Some time this morning. After the office opens I will get it and bring it up there.' He said, 'Is you right sure you will bring my money up there?' He said, 'Yes, sir, if I don't bring it I will send it by my boss man', like that. He said, 'You could have done paid that little money, but you just laying around telling a God damn lie, you God damn black son of a bitch. I am a good mind to kill you.' And he shot twice (through the wooden door shutter into the house). After he shot twice, Alfred, then he walked towards the dresser, and he walked back towards the fireplace, and then he shot, made two shots, and then he (Wheat) made two more shots, and the fire, I could just see the fire spring from the pistol shot. Then I commenced screaming and hollering. I said, 'White folks, don't kill me in here. There ain't anybody here but me and my children. Don't kill me and my children.' Well, I was hollering and screaming so loud, then everything quietened down, and then Alfred started out the door, and when he started out the door, I said, 'Alfred, Alfred, please don't go out there.' I said, 'Alfred, he will kill you out there.' So he walked right on out the door. By that time I got up, but I was so scared and nervous. I got up and kind of made it to the door. When I made it to the door, I cracked the door and looked out, but I didn't see Alfred nowhere, and this black car, what I took to be his (Wheat's car), it was *turning around right in front of the house,* and drove on back this way, like he was coming to Queen City, kind of slow, driving along slow. * * *." [Italics and parenthesis supplied.)

The defendant's evidence further goes to show that after deceased fired the last two shots into the house, deceased walked to his automobile which had been parked nearby, and drove it through the City of Tuscaloosa, a distance of more than a mile, to the police station. The hospital was near the place where he was shot and on the same street. He entered the police station, gave his pistol to the officers and there stated in the presence of three officers that Alfred Thomas, the defendant, had shot him and that he, deceased, had shot four times. The deceased made other statements

at the police station as to how the shooting occurred, the address, and his purpose in going there. All of the conversation of the deceased was admitted in evidence, although the defendant was not present at the time the deceased made the statements to the officers. The deceased remained at the police station 15 or 20 minutes and was taken to the hospital. It was not yet daylight at this time and he lived on into the following day. He made no statement to his wife or to the doctor indicating his belief that he was about to die, although he talked with them, and he made no further statement with reference to the facts of the shooting, other than the statements made at the police station. Deceased lived about 20 hours after the shooting. At the police station the deceased was bleeding freely and was perspiring. He made no complaint of suffering pain but appeared to be shocked.

The trial court permitted all the conversation of deceased with the police officers to be, offered in evidence on the theory that it was a dying declaration. The court permitted the police officers to testify that the deceased stated that the defendant shot deceased and shot first. There were no statements made by the deceased that indicated he was in "extremis" or that death was impending or that he had no hope of life or hope of recovery. The deceased, while discussing with officers the details and identity of his assailant stated, "I believe he got me." There were no further words to indicate what deceased meant by that statement and that statement was the only statement in the way of a predicate that the state was able to show.

The testimony of the defendant was in substance the same as that of Georgia Crim and was corroborated by other witnesses examined by the defendant and the photographs of the front door of the house opening into the defendant's bedroom showing bullet holes through the screen door and the door shutter and the only material conflict in the evidence was the statement in the declaration of the deceased made at the police headquarters to the three officers at headquarters when deceased drove up and got out of his car and walked in and told the officers about the shooting, in which he is alleged to have stated that defendant fired the first shot, was admitted in evidence over timely objections of the defendant and to which he reserved exceptions.

One of the major questions presented is as to the sufficiency of the predicate on which the statement was admitted as a dying declaration by the deceased. The substance of the testimony offered to show that said statement was made by the deceased under a consciousness of impending death goes to show that deceased arrived at headquarters about 5:30 o'clock in the morning on December 6, 1948 and when he walked in the station one of the officers, Mr. Morrison, noted blood running down his left side, that deceased made a statement as to what had happened and as to how it happened and said, "I believe he got me." The testimony shows that he was wounded at the time and that deceased said he had been shot. At the time these statements were made deceased was standing up, leaning on the counter and the witness testified, "You could tell he was weak; that the perspiration was popping out over his forehead and face * * * he was a little pale or white."

Witness was asked, "Did he appear to be suffering at the time, Mr. Morrison?

"A. Yes, sir.

"Q. Did he make that statement shortly after he entered police headquarters door there? A. Yes, he hadn't been there long but just a short time when he made the statement, 'I believe he has got me.'

"Q. Now tell us what he said, then, there on that occasion if he said anything with reference to having been shot, what did he say about that? A. Now you better ask me the question again. Let me get it clear.

"Q. Just tell us what he said there on that occasion, if anything, with reference to having been shot, or how he got shot, or who shot him? Just what did he have to say about that? A. He told who shot him.

"Q. Who did he say shot him? A. Alfred Thomas.

"Q. Alfred Thomas? A. Yes, sir.

"Q. Did he tell you where the shooting took place? A. Yes, sir.

"Q. Do you recall the address he gave you? A. I am pretty sure, 1415 15th Street. I know it was on 15th Street.

"Q. Did he say how the shooting occurred, Mr. Morrison? A. Yes.

"Q. What did he say about how the shooting occurred? A. He said he knocked on the door, and I can't remember the name of the woman that lived there * * *

"Q. It was Annie May? A. And he said she started to answer the door and he told us that Alfred said he would answer the door.

"Q. She started to answer the door, and then he heard Alfred say, 'I will answer the door?' A. I will answer the door, and when he opened the door he opened fire.

"Q. What else did he say on that occasion? A. He said he was hit and then returned the fire."

On cross examination Morrison testified that the deceased didn't know, to be exact, how many times he shot, and that when deceased was placed on the stretcher brought by the ambulance he "told me to raise him up, he couldn't lie down," and repeated, "I believe he got me."

The testimony of the other witnesses offered by the state to show the declaration of the deceased was in all things in substance the same as the witness Morrison. One of the police officers at the station when Wheat came in called for the ambulance and he did not hear all of the deceased's statement. Deceased made no objection or protest about being carried to the hospital and made no request for medical aid. The evidence shows that deceased lived until the next morning and died between two and three o'clock; that he remained conscious until a short time before his death and did not complain of suffering and made no further statement about the shooting to either the doctor in attendance or to his wife, who were with him until death.

 While said statement, "I believe he has got me," considered in the light of the circumstances shown by the evidence connotes that deceased probably considered the wound serious, it falls far short of showing that the statements testified to were made under a consciousness of approaching death, impending at the time, "sufficient to dispel from the mind all motive for making a false statement, in view of the fact that the party recognized the fact that he should soon appear in the presence of his Maker." Parker v. State, 165 Ala. 1, 8, 51 So. 260, a fact essential to the admissibility of such statement as a dying declaration, to bring it within the exceptions to the rule against hearsay testimony. The following authorities illustrate the necessity that *the declarant must be conscious of impending death:* Justice v. State, 99 Ala. 180, 13 So. 658; Titus v. State, 117 Ala. 16, 23 So. 77; Blackburn v. State, 98 Ala. 63, 13 So. 274; Pulliam v. State, 88 Ala. 1, 6 So. 839; Young v. State, 95 Ala. 4, 10 So. 913; Hammil v. State, 90 Ala. 577, 8 So. 380; Kilgore v. State, 74 Ala. 1; Sims v. State, 139 Ala. 74, 36 So. 138; Marshall v. State, 219 Ala. 83, 121 So. 72, 63 A.L.R. 560; Culberson v. State, 22 Ala.App. 493, 117 So. 397; Parker v. State, 165 Ala. 1, 8, 51 So. 260; Shikles v. State, 31 Ala. App. 423, 18 So.2d 412; Cole v. State, 105 Ala. 76, 16 So. 762; Phillips v. State, 3 Ala.App. 218, 57 So. 1033; Patillo v. State, 245 Ala. 192, 16 So.2d 303; Moomaw v. State, 23 Ala.App. 125, 121 So. 904; Parker v. State, 24 Ala.App. 72, 130 So. 525; Ratliff v. State, 19 Ala.App. 505, 98 So. 493; Gissendanner v. State, 18 Ala.App. 199, 89 So. 835; Fonville v. State, 91 Ala. 39, 8 So. 688; Evans v. State, 209 Ala. 563, 96 So. 923; Dumas v. State, 159 Ala. 42, 49 So. 224; Johnson v. State, 102 Ala. 1, 16 So. 99; State v. Meyer, 86 Am.St.Rep. 638 for annotation.

The evidence goes to show that deceased was more interested in reporting the ren-

counter and having Thomas apprehended that he was for medical aid on account of his wounds.

The state relies on Marshall v. State, 219 Ala. 83, 121 So. 72, 73, 63 A.L.R. 560. We note in that case the doctor was called to administer medical aid to the deceased. In that case the doctor testified: "When I went in he (deceased) said, 'Doctor, she has got me.' I said, 'Who got you, Mr. Marshall?' He said, 'My wife—I was lying on the cot asleep, with my face to the wall: I heard the report of the gun and I turned over, and felt something hot running down my back—when I turned over I fell off the cot.' I said, 'Mr. Marshall, I can do nothing for you here, I will have to take you to the hospital.' He said, 'I think it is unnecessary.' I said, 'It is the thing to do.' He said, 'Yes, take me to the hospital.' " This testimony showed that at the time the statement was made the deceased was under conscious belief of impending death and that hospitalization was unnecessary. The mere fact of the insistence of the doctor that the thing to do was to take deceased to the hospital, may have inspired some hope in deceased's mind, did not change the fact that when the deceased made the statement he had the conscious belief that treatment was useless. Not so in this case. The facts above stated differentiate the Marshall case from this.

■ We are, therefore, of opinion that the court committed reversible error in permitting the statement of the deceased in evidence as a dying declaration. The statement was objectionable as hearsay, which objections were specifically and strenuously made, accompanied by motion to exclude, all of which were overruled by the court and exceptions reserved by the defendant.

■ The evidence is without dispute that the defendant was in his own bedroom, rented by him for occupancy as such, and said room for the purpose of self defense was his castle. The law regards with jealousy the peace and security of the dwelling. A trespass upon it is more than a trespass on property. It is a trespass upon the person. Crawford v. State, 112 Ala. 1, 21 So. 214; Harris v. State, 96 Ala. 24, 11 So. 255. One who intrudes or trespasses upon a dwelling with felonious intent or in such manner as to create a reasonable belief in the mind of the occupant that such is his purpose, may be killed, and the homicide will be in self defense. Crawford v. State, 112 Ala. 1, 21 So. 214; Christian v. State, 96 Ala. 89, 11 So. 338; Lee v. State, 92 Ala. 15, 9 So. 407, 25 Am.St.Rep. 17.

■ Therefore, after full and careful consideration of the testimony in this case, including the declaration of the deceased admitted in evidence as a dying declaration, we are of opinion that the verdict of the jury is against the great weight of the evidence and should not be allowed to stand.

We are further of the opinion that so much of the observation of Chief Justice Anderson in Goldsmith v. State, 232 Ala. 436, 168 So. 547, 548, as follows, is here pertinent and applicable:

" * * * Had all these parties been of the same race, or if conditions had been reversed, we feel sure that there would have been a different verdict and that the present one was actuated by passion or race prejudice; not perhaps from corrupt motives, but from an inborn and uncontrollable antagonism between the two races, when a negro kills a white man or when a white man kills a negro; an antagonism which seldom exists in the administration of justice by the strong to the weak for the commission of most other offenses."

We are, therefore, of opinion that the court erred in overruling the defendant's motion for new trial and for this and the other errors noted, the judgment of conviction and sentence is reversed and the cause will be remanded.

Reversed and remanded.

FOSTER, J., concurs.

LIVINGSTON, C. J., and SIMPSON, J., concur in so much of the opinion as holds that the predicate for the admission of the alleged dying declaration of the

deceased was insufficient to warrant its admission in evidence, that the verdict of the jury was contrary to the great weight of the evidence, that the court erred in overruling the motion for new trial and that for these errors the judgment of conviction and sentence should be and is reversed and the cause remanded.